**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

STEPHEN WALKER,

        Plaintiff,

v.                                                          CIVIL ACTION NO.  5:09-cv-00723

WEST PUBLISHING CORPORATION,

        Defendant.


**MEMORANDUM OPINION AND ORDER**

On May 9, 2009, in the Circuit Court of Raleigh County, West Virginia, Plaintiff, Stephen

Walker, initiated this action against his former employer, Defendant West Publishing Corporation,

doing business as Thomson West, ("West"), alleging that he was unlawfully discharged in retaliation

for opposing and reporting the practice of "churning."  Plaintiff also alleges that Defendant failed

to pay his wages in full, within seventy-two (72) hours subsequent to the end of his employment, in

violation of West Virginia Wage Payment and Collection Act, W. Va. Code § 21-5-1, et seq.  On

June 26, 2009, Defendant removed this civil action by invoking this Court's diversity jurisdiction

under 28 U.S.C. § 1332.  Since that time, the parties have engaged in discovery and Defendant now

moves for summary judgment. *See* Defendant's Motion for Summary Judgment With Incorporated

Memorandum of Law ("Def.'s Mot.") (Document No. 52).  Upon consideration of the instant

motion, Plaintiff's opposition thereto (Documents No. 54 and 84),  Defendant's reply  (Documents

No. 58 and 119), the attached exhibits and the entire record therein, the Court, for the reasons that follow denies, in part, Defendant's motion.[1]

## I. FACTUAL AND PROCEDURAL HISTORY

In September 1999, Plaintiff began working as a law firm representative for West, a subsidiary of Thomson Reuters business, which publishes legal, regulatory and business information in electronic and print mediums.  In 2005, Plaintiff applied for and obtained a promotion to the Regional Sales Manager position with coverage over law firm field representatives in West Virginia and Virginia.  In his new role, Plaintiff's initial base salary was $90,000.00 plus commission, bonuses and incentives. He reported to Maria Redmond, the Director of Sales for the Southern Division.[2]

Thereafter, in February 2008, one of Plaintiff's field sales representatives, Karen Hurley, reported to Plaintiff that Robert Woehrle, a "New to Online" sales representative, had been in contact with an associate of one of her existing Virginia law firm accounts.  As a "New to Online" representative, Mr. Woehrle was not supposed to call people with existing accounts.  Ms. Hurley reported that Mr. Woehrle was attempting to cancel the firm's existing Westlaw contract and sell an associate a new contract.  While the parties dispute the details of the communications between Mr. Woehrle and the Virginia law firm associate, the parties do not contest that Mr. Woehrle told the

---

[1]   On July 29, 2011, the Court denied Defendant's Motion to Strike Plaintiff's Supplemental Response to Motion for Summary Judgment, thereby, permitting the submission and review of Plaintiff Stephen Walker's Supplemental Response to Defendant's Motion for Summary Judgment (Document No. 84.) *See* Order (Document No. 116).  Thereafter, without seeking leave of court, Defendant filed its Supplemental Reply to Plaintiff's Supplemental Response to its Motion for Summary Judgment (Document No. 119).  The Court has considered each of the parties' submissions and will refer to the arguments submitted as a whole.

[2]   Ms. Redmond is also referred to as Maria Rego in the parties' exhibits.

associate to send him an email to inform him that the firm was going out of business and that the associate, in fact, sent Mr. Woehrle an email disclosing that a partner of the firm was leaving and that the business would be winding down.  The new contract would supposedly serve the associate in his new solo practice.   Mr. Woehrle thereafter forwarded the request to terminate the existing contract and advised Ms. Hurley of the transaction.   Upon further inquiry into the nature of the transaction, Ms. Hurley learned that although a partner of the firm was leaving, the firm was continuing to operate with a change of its members in the same location.  The firm's associate became a partner and there were plans to hire a new associate.  Plaintiff became concerned about the nature of the transaction and attempted to learn more about Mr. Woehrle's actions from Mr. Woehrle's supervisor, Mark Haddad.  After he was unable to resolve the dispute and believing the transaction to be one representative of "churning," Plaintiff advised his supervisor, Ms. Richmond of the transaction.  He advised Ms. Richmond that the existing contract was valued more than the new contract being offered, that the firm was in fact still operating and that West would take a loss on the new business. He also discussed that the new contract would include commission and bonuses on a contract that was not a "new" account.  He characterized the transaction as a fraud and advised that he and his representative would not take any of the commission for the transaction.  Plaintiff has testified that he felt the transaction was fraudulent to Defendant's shareholders because Defendant would take a loss on the value of the Westlaw service contracts and the Defendant would also have to pay commission and bonuses on a "new" account.  He considered the transaction as improper and fraudulent.  Ms. Richmond subsequently prompted an investigation into the transaction.  Defendant's Corporate Compliance and Audit Group conducted an investigation and ultimately found that there was no wrongdoing by its employee. The investigation revealed that the law associate was either

3

dishonest in his representations or there was a miscommunication between the associate and Mr. Woerhle. Ultimately, Defendant did not allow the cancellation of the existing Westlaw contract.

In September of 2008, Philip Klacan, manager of territory planning, and other management executives sought to realign Defendant's sales territories to accomplish its business goals for 2009. The remapping of sales territories was part of a yearly process. In October 2008, as a result of the redistricting, Defendant determined that three Regional Sales Managerial positions would be lost in the Southeast, North Central and Northeast Districts. Plaintiff's region merged with the Washington, D.C. market which was managed by Michael Farmer. Ms. Redmond determined that the Washington, DC sales market should serve as the hub in the newly merged district. As a result of West's policy, Human Resources Manager, Ann Ross, testified that if two managers are eligible for a regional sales manager position after the two districts collapsed, geographical location of the managers to the hub is the sole relevant consideration to determine the manager position, if each manger is meeting expectations at work. Mr. Farmer lived in the Washington D.C. metro area while Plaintiff resided in Daniels, West Virginia. Due to Mr. Farmer's close proximity to Washington D.C., he assumed the managerial role of the new district. Plaintiff was advised on November 14, 2008 that his position was eliminated. Plaintiff contends that his November 2008 performance results ranked him higher than Mr. Farmer.

As a result of the redistricting, two Regional Sales Manager positions were opened and posted internally. Preference was given to the three sales managers displaced by the redistricting for the open positions in Sacramento, California and Cincinnati, Ohio. Of these three regional sales managers, Lisa Das was the only applicant for the open position in California. Plaintiff testified that he was not aware of the position, but that he would have applied had he known about it. Ms. Das

was hired for the California position. Plaintiff and Les Damlo, the third displaced regional sales manager, both applied for the Ohio position.  Plaintiff was told that the applicant must live in the region.  At that time, Plaintiff lived in West Virginia which was included in the Ohio region that also included Kentucky.  Mr. Damlo resided in Kansas City, Kansas. However, since the position was open and posted, the determination of the regional sales manager was not made by geography to the market hub, Cincinnati, Ohio. Instead, the decision turned on the experience of the applicants.  In this instance, Les Damlo was offered and accepted  the position in Ohio. He was given one year to relocate to Ohio.  Mr. Damlo never relocated to Ohio because he transitioned into a new position before the one year ended.

Thereafter, Plaintiff applied for more than twenty-two positions in the corporation.  He was never hired for any.  He was offered a severance package, but he declined to sign the agreement. Plaintiff separated from the corporation effective January 1, 2009.  Plaintiff received his last pay check from Defendant on January 9, 2009.

In May 2009, Plaintiff initiated this action alleging that after he reported the incident of "churning" the Director of Sales, Ms. Redmond, began to retaliate against him.  He alleged Defendant willfully, maliciously, and unlawfully terminated his employment as a result of his reporting the "churning" transaction. He has asserted two causes of action: (1) Defendant's actions constituted an unlawful discharge as Defendant was motivated by the contravention of a substantial public policy of the State of West Virginia and (2) Defendant violated the West Virginia Wage Payment and Collection Act, W. Va. Code § 21-5-1, et seq., when it failed to pay his wages in full within seventy-two hours of his discharge.

5

Defendant removed the action to this Court on June 26, 2009.  West is a Minnesota corporation, with its principal place of business in Eagan, Minnesota.  (Not. of Removal ¶ 3; Am. Compl. ¶ 2).  Plaintiff is a resident of Raleigh County, West Virginia.  ((Not. of Removal ¶ 2; Am. Compl. ¶ 1).  The parties are diverse, and the amount in controversy exceeds $75,000 (Not. of Removal ¶ 5), therefore, the Court's diversity jurisdiction, pursuant to 28 U.S.C. § 1332, was properly invoked.  The parties do not contest jurisdiction.

In the instant motion, Defendant moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  The matter is ripe for resolution.

## II.  STANDARD OF REVIEW

The well-established standard in consideration of a motion for summary judgment is that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U .S. 242, 247 (1986).  Rule 56 of the Federal Rules of Civil Procedure requires that,

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed.R.Civ.P. 56(c)(1).   A "material fact" is a fact that might affect the outcome of a party's case. *See Anderson*, 477 U.S. at 248; *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).  A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor.  *Id*.

The moving party bears the burden of showing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law.  *Celotex Corp.*, 477 U.S. at 322-23.  In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  However, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor."  *Anderson*, 477 U.S. at 256.  Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, an evidentiary showing sufficient to establish that element.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  If the nonmoving party fails to make a showing sufficient to establish the existence of an essential element, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 322-23.  If factual issues exist that can only be resolved by a trier of fact because

they may reasonably be resolved in favor of either party, summary judgment is inappropriate. *Anderson*, 477 U.S. at 250.

## III.  DISCUSSION

Defendant moves for summary judgment on the basis that Plaintiff cannot establish a prima facie case for wrongful termination in violation of public policy or for wage violations under the West Virginia Wage Payment and Collection Act ("WPCA").  Upon consideration of Plaintiff's first cause of action, Defendant argues that with respect to an "internal dispute of a company's employees involving sales commissions," no substantial public policy exists based  upon several criminal statutes contained in the West Virginia Code at Chapter 61, Article 3, regarding crimes against property.  Defendant argues that these statutes do not create a private cause of action.  Defendant also argues that Plaintiff fails to demonstrate that a common law claim of fraud is a substantial public policy source for his wrongful termination because Plaintiff cannot show that Defendant or it employees were fraudulent or that he was damaged by any alleged fraudulent act.  Additionally, Defendant argues that summary judgment is warranted because Plaintiff cannot demonstrate that the Sarbanes-Oxley Act supports a substantial public policy where (1) there is no evidence of any wrongdoing or "churning" activity, (2) Plaintiff never reported nor threatened to report any incident to any outside party or governmental entity, and (3) there is no indicium of public trust or interest in Plaintiff's alleged action or how West treats a sale of its product to a customer.  Defendant contends that Plaintiff cannot cite a specific statute, law or even court ruling that would support the assertion that his  alleged action in this case is protected by a substantial public policy of West Virginia.

8

Defendant also moves for summary judgment on Plaintiff's second cause of action for the alleged violation of the WPCA. Defendant's argument centers around its contention that Plaintiff's job was eliminated due to a reduction in workforce caused by redistricting. In that instance, Defendant asserts that Plaintiff's claim fails because it paid Plaintiff his full wages which were capable of calculation by the next pay period which is all that is required, by the broad language of W. Va. Code § 21-5-4(d), when an employee is laid off. However, Defendant contends that if this Court finds that the reduction in the workforce is not a layoff, and that it should have paid Plaintiff within 72 hours, as required by W. Va. Code § 21-5-4(c), the commission component of Plaintiff's compensation claim was not "capable of calculation" at that time, as contemplated by W. Va. Code § 21-5-1(c), since commissions are subject to adjustments, returns, charge backs and credits. Additionally, Defendant denies Plaintiff's assertion that he was paid incorrectly starting in January 2008, a year before the effective date of his layoff, and contends that several facts indicate that (1) Plaintiff bases all of his calculations on an estimate of what he was owed, not what actual sales numbers were, (2) some of Plaintiff's calculations are based upon his disagreement with changes made to West's compensation Plan regarding bonuses, and (3) all of the bonuses to which he claims entitlement, were either due to be paid months before Plaintiff was laid off or not until weeks or months after the layoff. For these reasons, Defendant argues that Plaintiff's calculations are unreliable and speculative. In opposition,[3] Plaintiff contends that his discharge was in retaliation for

---

[3] *See supra* n.1. Plaintiff initially opposed Defendant's motion on March 18, 2011. (Plaintiff Stephen Walker's Response to Defendant's Motion for Summary Judgment ("Pl.'s Opp'n") (Document No. 54)). At that time, Plaintiff characterized Defendant's motion as premature and qualified several of his arguments by stating that he was unable to fully respond since discovery was not yet complete. (Pl.'s Opp'. at 1, 8, 12.) On July 5, 2011, Plaintiff filed a Supplemental Response to Defendant's Motion for Summary Judgment ("Pl's. Supp.") (Document No. 84) which he contends accounts for consideration of a more complete record. The Court has reviewed each filing and will discuss Plaintiff's assertions as a whole. Additionally, to the extent that Plaintiff initially qualified several of his arguments as

(continued...)

reporting an incident of churning, which he perceived as a fraud on the company and its shareholders. He argues that he has asserted various sources demonstrating a significant public policy to support his *Harless* wrongful termination claim.  Contrary to Defendant's contention, Plaintiff asserts that criminal statutes have been the basis for finding wrongful termination in violation of public policy where the employee was terminated for refusing to engage in illegal activity.  Plaintiff contends that he was terminated for refusing to accept the higher commissions and bonuses generated from a churned transaction.  He contends that he "expressed his belief that allowing the churned transaction was equivalent to fraud, thus he refused to participate in illegal activity." (Pl.'s Opp'n at 11; Pl.'s Supp. at 18.) Additionally, he asserts that the whistle-blowing protection afforded by the Sarbanes-Oxley Act aptly demonstrates a significant public policy prohibiting employers from retaliating against employees when they provide information about potentially wrongful conduct.  Plaintiff argues that he only has to show a "subjective belief and objectively reasonable belief that the conduct of which he complained constituted a violation of relevant law." (Pl.'s Opp'n at 8; Pl.'s Supp. at 14.)  Plaintiff contends that he has made the requisite showing because the activity of churning would have defrauded Defendant of commissions and bonuses that employees were not entitled to and because cancelling an existing contract valued more than the proposed new contract would result in a loss to Defendant and its shareholders.  Plaintiff asserts that he reported the alleged incident of churning to his supervisor, Maria Redmond, and contends that the fact that the transaction was not completed is of no consequence to his claim. Plaintiff also argues that Defendant's own Code of Business Conduct and Ethics prohibits churning

---

[3](...continued)
incomplete, the Court will consider that his supplemental response has cured any stated deficiency.

and contains an anti-retaliation policy for reporting fraudulent or dishonest activity.  Therefore, Plaintiff argues that summary judgment is not warranted as to his first claim of action.

Likewise, Plaintiff contends there are genuine disputes as to material facts precluding summary judgment on his WPCA claim. Specifically, Plaintiff argues that he is owed approximately $77,966.87 of unpaid incentive bonuses, which were earned in 2008 prior to his termination. Plaintiff contests Defendant's assertion that his claim is unreliable, speculative and without support. He contends, instead, that his unpaid wages were calculated using Defendant's internal reports regarding sales and revenue, formulas from his 2008 compensation plan, and reliable estimates containing his sales team forecast for the months of November and December 2008.  Plaintiff argues that he was relegated to using estimates for two months because Defendant failed to provide him with the requested information.[4]  Additionally, Plaintiff argues, prior to his termination, he advised Defendant's Divisional Director of Finance, Andrea Spronk, that there were inaccuracies in his sales figures for certain times in 2008.  He contends that Ms. Spronk verified that his actual sales numbers where higher than reported and that he used these figures to compute the amount of his unpaid bonuses.

Additionally, Plaintiff contends that not only did Defendant fail to pay his wages in full, but Defendant failed to do so within the required statutory time period of seventy-two (72) hours. Plaintiff asserts that he was discharged or terminated, rather than laid off as Defendant contends, which is evidenced by documents provided by Defendant referring to his "termination."  As a result, Plaintiff argues that he was entitled to full payment of his wages, inclusive of commissions and

---

[4]   Defendant contends that Plaintiff did not request actual sales figures for these months during discovery. Plaintiff disagrees.  The subject of this dispute is currently pending before the assigned Magistrate Judge.

bonuses, within seventy-two (72) hours from the date of his termination.  Plaintiff asserts that his wages were capable of calculation within seventy-two (72) hours because (1) Defendant has an established and internally known guaranteed cutoff date for the assembly of monthly sales information and (2) Defendant had advance notice of a minimum of forty-nine (49) days between November 12, 2008, the date he was notified of his termination, and his effective date of termination on January 1, 2009, in which to calculate his commission and bonuses.  Plaintiff argues that as a result of the untimely payments he is entitled to liquidated damages as set forth by the applicable WPCA statute as well as attorneys' fees.

In its reply, Defendant maintains that Plaintiff has not stated a significant public policy to support his wrongful termination claim under either the Sarbanes-Oxley Act or the criminal statutes.  Defendant argues that Plaintiff cannot make a prima facie case under the Sarbanes-Oxley Act because (1) he fails to show that his communications to his employer related to one of the laws listed in 18 U.S.C. § 1514A; (2) churning does not have anything to do with the purpose of the Act to promote reliability of corporate disclosures made pursuant to securities laws; and (3) a reasonable shareholder would not find a single allegation of churning to be sufficiently important to an investment decision. Defendant also maintains that Plaintiff's reliance on the criminal statutes at issue in this case is misplaced since no crime was committed.  Defendant argues that there was no crime of fraud involved in Plaintiff's allegation of churning because the disputed transaction would have resulted in a reduction of price to the customer.

With respect to Plaintiff's WPCA claim, Defendant maintains that it paid Plaintiff his full wages, then capable of calculation, by the pay period following his termination, which is all that is required by West Virginia law for employers who are laid off as a result of a workforce reduction.

Defendant argues that Plaintiff's assertion that he is owed wages is improper in that the claim is based on scorecard sales figures, estimates and his disagreement with a change in West's compensation plan, rather than actual sales figures for his field service representatives. Defendant further argues that Plaintiff has not accounted for charge backs and refunds. Defendant also maintains that its policies indicate that Plaintiff's final commission could not be settled and reconciled within seventy-two hours of Plaintiff's termination. Defendant argues that it was not capable of calculating Plaintiff's sales numbers until at least January 2009, after he was terminated. Defendant also contends that if Plaintiff's bonuses were inaccurate then the bonuses of his field service representatives and supervisors would also be inaccurate. However, there is no evidence in the record of any inaccuracy for Plaintiff's former co-workers.[5]

The Court will now review Plaintiff's causes of action in turn.

A.  *First Cause of Action: Wrongful Termination in Violation of Substantial Public Policy*

Plaintiff's complaint does not set forth the nature of the public policy which he alleges Defendant violated when it discharged him. Instead, Plaintiff generally alleged that he was retaliated against after he reported an incident of churning. Therefore, Defendant, in its memorandum in support of his motion for summary judgment utilizes Plaintiff's discovery responses in which Plaintiff asserts varied theories as to the source of public policy.[6] Defendant contests the sources

---

[5]  Any reference herein to arguments made by Defendant in its reply encompasses its contentions made in both of Defendant's submissions. (*See* Defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment ("Def.'s Reply") (Document No. 58); Defendant's Supplemental Reply to Plaintiff's Supplemental Response to Its Motion for Summary Judgment ("Def.'s Supp.") (Document No. 119)).

[6]  In his Response to Defendant's First Set of Interrogatories, Requests for Production of Documents and Requests for Admissions, Plaintiff provided a plethora of sources he contends demonstrate the substantial public policy at issue in this case. Specifically, Plaintiff listed the following:

(continued...)

and contends that summary judgment is warranted because Plaintiff has failed to identify a significant pubic policy. As an initial matter, Defendant asserts that Plaintiff fails in his assertion that common law claims for civil conspiracy and tortious interference with existing or prospective business and/or contractual relationships provide an alternative substantial public policy source to support his retaliatory discharge claim. Plaintiff, in opposition, seemingly abandons these theories which were advanced in his discovery responses as he does not contest or present any responsive arguments with regard to Defendant's contention. (*See* Documents No. 54 and 84). Therefore, this Court need not consider whether such cause of actions can support an allegation of wrongful discharge in contravention of a substantial public policy. By virtue of Plaintiff's abandonment, Defendant's motion for summary judgment as to Plaintiff's first cause of action, with respect to these two theories, is granted.

In resolution of the balance of Defendant's assertions, the Court must determine whether an employee's reporting of suspected fraudulent conduct is a "substantial pubic policy" exception to the at-will employment doctrine, which provides the basis for a wrongful discharge action.

---

[6](...continued)

- W. Va Code § 61-3-20 (Embezzlement);
- W. Va Code § 61-3-22 (Falsifying accounts);
- W. Va Code § 61-3-24 (Obtaining money, property and services by false pretenses; disposing of property to defraud creditors);
- W. Va Code § 61-3-24d (Fraudulent schemes; cumulation of amounts where common scheme exists);
- W. Va Code § 61-3-37 (False statement as to financial condition of person, firm or corporation);
- common law fraud, tortious interference with existing or prospective business and/or contractual relations, and civil conspiracy
- Sarbanes-Oxley Act.

Def.'s Exh. F. (Document No. 53).

In West Virginia, "employees and employers alike are generally governed by the at will employment doctrine." *Feliciano v. 7–Eleven, Inc.*, 559 S.E.2d 713, 717 (W.Va.2001); *see also Eaton v. City of Parkersburg*, 482 S.E.2d 232, 236 (W.Va.1996) ("In the absence of other evidence, West Virginia law presumes that employment is at will."). "[A]n at-will employee serves at the will and pleasure of his or her employer and can be discharged at any time, with or without cause." *Feliciano*, 559 S.E.2d at 718 (internal citation omitted). However, the Supreme Court of Appeals of West Virginia has cautioned that this rule is not absolute. Instead, this rule governing the at will doctrine "must be tempered by the . . . principle that where the employer's motivation for the discharge contravenes some substantial public policy principle, then the employer may be liable to the employee for damages occasioned by this discharge." *Harless v. First Nat'l Bank in Fairmont*, 246 S.E.2d 270, 275 (W.Va.1978). Therefore, in West Virginia "a cause of action for wrongful discharge exists when an aggrieved employee can demonstrate that his/her employer acted contrary to substantial public policy in effectuating the termination." *Feliciano*, 559 S.E.2d at 718. This tort cause of action set forth in *Harless* has commonly been referred to as an action for "retaliatory" or "wrongful" discharge. *Slack v. Kanawha County Hous. & Re-Dev. Auth.*, 423 S.E.2d 547, 555 n.8 (W. Va. 1992). It is the Plaintiff's burden to demonstrate that a substantial public policy exists. Moreover, "a determination of the existence of public policy in West Virginia is a question of law, rather than a question of fact for a jury." *Cordle v. Gen. Hugh Mercer Corp.*, 325 S.E.2d 111, 114 (W.Va.1984); *Feliciano*, 559 S.E.2d at 717.

The Supreme Court of Appeals has provided that in order to obtain relief under a claim for wrongful discharge in contravention of substantial public policy, the plaintiff must show:

> (1) [Whether a] clear public policy existed and was manifested in a
> state or federal constitution, statute, administrative regulation, or in
> the common law (the *clarity* element); (2) [Whether] dismissing
> employees under circumstances like those involved in the plaintiff's
> dismissal would jeopardize the public policy (the *jeopardy* element);
> (3) [Whether t]he plaintiff's dismissal was motivated by conduct
> related to the public policy (the *causation* element); and (4) [Whether
> t]he employer lacked an overriding business justification for the
> dismissal (the *overriding justification* element).

*Swears v. R.M Roach & Sons, Inc.*, 696 S.E.2d 1, 6 (W. Va. 2010) (citing *Feliciano*, 559 S.E.2d at

723) (internal citations omitted).

The Supreme Court of Appeals has admitted that it "has sometimes struggled" with

determining what constitutes a public policy issue preventing an at-will employee from being

terminated. *Wounaris v. W. Va. State College*, 588 S.E.2d 406, 414 (W. Va. 2003). Further it

admits that "the outlines of public policy are elusive, [and] describe[d] the concept as both nebulous,

and hard to define." *Id*. (internal quotations and citations omitted.) However, the Supreme Court

has provided guidance to aid in the determination of the existence of a "public policy." For instance,

the court has stated that "public policy is that principle of law which holds that no person can

lawfully do that which has a tendency to be injurious to the public or against public good even

though no actual injury may have resulted therefrom in a particular case to the public." *Cordle*, 325

S.E.2d at 114 (quoting *Allen v. Commercial Cas. Ins. Co.*, 131 N.J.L. 475, 477-78, 37 A.2d 37, 39

(1944) (internal quotations and citations omitted.) "To identify the sources of public policy for

purposes of determining whether a retaliatory discharge has occurred, we look to established precepts

in our constitution, legislative enactments, legislatively approved regulations, and judicial opinions."

*Birthisel v. Tri-Cities Health Servs. Corp.*, 424 S.E.2d 606, 612 (W.Va. 1992). Moreover, "[t]he term

'substantial public policy' implies that the policy principle will be clearly recognized simply because it is substantial." *Id*. Therefore, "to be substantial, a public policy must not just be recognized as such but must be so widely regarded as to be evident to employers and employees alike." *Feliciano*, 559 S.E.2d at 718.

In this instance, the parties largely dispute the showing of a substantial public policy. As one theory of a sufficient source, Plaintiff has proffered the Sarbanes-Oxley Act of 2002, Pub.L.No. 107-204, 116 Stat. 800 (codified in scattered sections of 15 U.S.C. and 18 U.S.C.) (2002). Section 1514A(a) of the Sarbanes–Oxley Act provides whistleblower protection for employees of publicly-traded companies by prohibiting employers from retaliating against them for "any lawful act done by the employee . . . to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes" mail fraud, bank fraud, securities fraud, or violation of any rule or regulation of the SEC, or any federal law relating to fraud against shareholders, when the information or assistance is provided to a person with investigatory authority. 18 U.S.C. § 1514A(a).

Defendant contends that Plaintiff cannot set forth a prima facie case to demonstrate a Sarbanes-Oxley violation largely because he failed to identify the specific law he believes was violated and because he did not report the conduct to any outside governmental agency. Plaintiff, in his opposition, does not identify the specific portion of the statute he believes was violated, just as Defendant contends. However, Plaintiff has generally asserted that at the time he learned of the Woehrle transaction, he believed the transaction constituted the practice of churning sales accounts. At the time, he subjectively believed that the transaction would be fraudulent to shareholders. Plaintiff has testified that shareholders would be impacted by a loss of revenue on the higher existing

17

contract and an additional loss of profits by paying commissions to Defendant's sales representatives for the new account.  Although Defendant's investigation of the matter did not result in a finding that its employees acted fraudulent, that does not extinguish Plaintiff's assertion that he believed fraudulent activity was occurring and he reported the same to his supervisor.   The Court finds that Plaintiff's belief was objectively reasonable in light of what he knew about the transaction and Defendant's own policy discussion of defining churning accounts as unprofessional conduct.  *See* Pl.'s Ex. F. (2008 General Policies and Incremental Revenue Rules Addendum at 34-35) (defining churning as "Establishing a new account when a current account already exists, [c]anceling subscriptions and re-entering canceled/changed items as new order, [and] [p]ersuading customers to cancel subscriptions and encouraging the customer to reorder when new edition becomes available.").  There can be no dispute that Plaintiff reported the transaction and his actions led to an investigation.  Plaintiff clearly engaged in whistle-blower activity, an activity that this Federal law protects.  The Court finds unpersuasive Defendant's assertion that Plaintiff cannot make a prima facie case for violating 18 U.S.C. § 1514A(a).  Plaintiff is not charged with doing so, as he has not alleged a cause of action pursuant to 18 U.S.C. § 1514A(a).  If he was so required, there would never be a need to assert a *Harless* claim and, at the very least,  such a claim would simply be superfluous. Plaintiff merely has to identify an existing substantial public policy which was contravened by Defendant and in this instance he has identified the same in this statute that clearly prohibits retaliation for whisle-blowing.

        "West Virginia law specifically allows for federal statutes as a source for public policy under *Feliciano*." (Williams v. Basic Contracting Services, Inc., Civil Action No.5: 09-cv-00049, 2010 WL 3244888, at * 9 (S.D. W. Va. 2010) (Johnston. J.)(includes a collection of cases where West Virginia

Supreme Court of Appeals has in the past cite approvingly to other courts who have found public policy in federal statutes). Courts have been instructed that they are to "proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject." *Tiernan v. Charleston Area Med. Ctr., Inc.*, 506 S.E.2d 578, 584 (W. Va. 1998); *see also Washington v. Union Carbide Corp.*, 870 F.2d 957, 962 (4th Cir. 1989) (Court of Appeals expounded on the scope of this cause of action by acknowledging that West Virginia courts have proceeded with "great caution" and exercised restraint in its power to declare an employer's conduct as contrary to pubic policy by according "due deference to the West Virginia legislature as the primary organ of public policy.")

Even in light of clear legislative expression in the instant case, the Court has been cautious in its consideration of Plaintiff's identification of a substantial public policy. However, after careful consideration, the Court finds that the Plaintiff has stated a cause of action for wrongful discharge sufficient to survive summary judgment. Certainly, there is "evidence that West Virginia would consider retaliation for whistle-blowing as a violation of 'substantial public policy' [as it] may be found in its own policies for public employees." *Id.*(citing W. Va. Code § 6C-1-3. )[7] The public policy exception to the at-will employment doctrine is grounded in the principle that an employer should be prohibited from terminating an employee for reporting what he reasonably believes is fraudulent activity. If the Court found otherwise, there would be a chilling effect on employees

---

[7] Section 6C-1-3(a) provides that "No employer may discharge, threaten or otherwise discriminate or retaliate against an employee by changing the employee's compensation, terms, conditions, location or privileges of employment because the employee, acting on his own volition, or a person acting on behalf of or under the direction of the employee, makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste." W. Va. Code § 6C-1-3.

making such assertions in the future.  Such a result would clearly impact both the public and private sectors.

With respect to Defendant's contention that the cited criminal statutes do not serve as a basis for finding a substantial public policy, in light of the foregoing discussion, a finding by the Court is not necessary.  However, the Court finds that Defendant correctly argues that the Supreme Court of Appeals of West Virginia in *Swears* v. *R.M. Roach and Sons, Inc.*, has already determined that W. Va. Code §§ 61-3-13 and 61-3-20, a criminal statute upon which Plaintiff relies, does not express a public policy component such that the statutes may form the basis for a possible violation of a substantial public policy to support a claim for wrongful discharge.  Therefore, Plaintiff is not permitted to assert a violation of W. Va. Code §61-3-20 as a substantial public policy.  With respect to the balance of the criminal statutes, Defendant argues that the criminal statutes, to which the Plaintiff cites, do not give rise to a private cause of action.  Defendant expresses concern that if this Court "were to find that a private cause of action exists under these circumstances, a whole new field of tort liability would be created without any express legislative authorization."  (Def.'s Mot. at 10.) Defendant's concern is misplaced in this instance.  The criminal statutes to which Plaintiff cites in support of his first cause of action were not provided for the purpose of asserting or attempting to assert a private civil cause of action under each criminal statute.  Instead, Plaintiff appears to have provided the statutes to support his argument that there is a substantial public policy concern with respect to fraud. Again, the pertinent cause of action which was alleged in this instance is that of retaliatory discharge, which was recognized by the Supreme Court of Appeals in *Harless v. First Nat'l Bank in Fairmont*, 162 W.Va. 116, 246 S.E.2d 270 (1978).

Finally, the Court finds that there are genuine disputes of material fact with respect to the remaining elements of Plaintiff's cause of action. Specifically, whether the plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element); and whether the employer lacked an overriding business justification for the dismissal (the *overriding justification* element). There is evidence in the record that Plaintiff's supervisor, Ms. Redmond, was instrumental in the decision of retaining Mr. Farmer in the Washington, D.C. market regional sales manger position. Plaintiff asserts that it was her retaliatory action that led to the elimination of his position. Moreover, Defendant contends Plaintiff was ultimately separated from the company as part of its reduction in workforce efforts. Plaintiff contests that assertion by contending that he performed better than both Mr. Damlo and Mr. Farmer, both of whom retained positions with the Defendant.

Therefore for the reasons cited above, Defendant's motion for summary judgment is denied as to Plaintiff's first cause of action.

### B. Second Cause of Action: Violations of wage payment and collection act

Plaintiff alleges that Defendant failed to pay him incentive bonuses that he earned prior to his termination and that the wages he did receive were not timely paid within the required statutory time period after his termination. Plaintiff asserts that Defendant's actions were in violation of the West Virginia Wage Payment and Collection Act thereby entitling him to statutory liquidated damages.

The WPCA is "remedial legislation designed to protect working people and assist them in collection of compensation wrongly withheld." *Meadows v. Wal-Mart Stores, Inc.*, 530 S.E.2d 676, 688 (W. Va. 1999) (quoting *Mullins v. Venable*, 297 S.E.2d 866 (W. Va. 1982)). In light of the

21

policy undergirding the WPCA, the statute is construed liberally.  *Id.*  In relevant part, the WPCA applies to corporations that are "doing business" in West Virginia, that is, corporations which "hav[e] employees actively engaged in the intended principal activity of the . . . corporation in West Virginia."  W. Va. Code § 21-5-1(n).  Notably, the WPCA "does not establish a particular rate of pay, instead, it controls the manner in which employees in West Virginia are paid wages and it imposes on employers an obligation to pay employees' wages in a timely manner."  *Gregory v. Forest River, Inc.*, 369 Fed.App'x. 464, 465 (4th Cir. 2010) (internal quotations and citations omitted) (unpublished decision).  Pertinent to this case, "[w]henever a . . . corporation discharges an employee, such . . . corporation shall pay the employee's wages in full within seventy-two hours."  W. Va. Code § 21-5-4(b).  However, "when an employee for any reason whatsoever is laid off, the . . . corporation shall pay in full to such employee not later than the next regular payday . . . wages earned at the time of suspension or layoff." W. Va. Code § 21-5-4(d).  If a corporation fails to adhere to these requirements the corporation "shall, in addition to the amount which was unpaid when due, be liable to the employee for three times that unpaid amount as liquidated damages." W. Va. Code § 21-5-4(e).

The statute defines "wages" to include "accrued fringe benefits capable of calculation and payable directly to an employee." W. Va. Code § 21-5-1(c).[8]  Pursuant to W. Va. Code § 21-5-1(l),

---

[8]   The term "wages" means compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation. As used in sections four [§ 21-5-4] . . . of this article, the term "wages" shall also include then accrued fringe benefits *capable of calculation* and payable directly to an employee: Provided, That nothing herein contained shall require fringe benefits to be calculated contrary to any agreement between an employer and his employees which does not contradict the provisions of this article.

"fringe benefits" encompass production incentive bonuses.[9]  Further, "whether fringe benefits have

then accrued, are capable of calculation and payable directly to an employee so as to be included in

the term "wage" are determined by the terms of employment and not by the provisions of [the

WPCA]."  *Meadows*, 530 S.E.2d at 690.  "However, the terms of employment must be express and

specific so that employees understand the amount, if any, of the fringe benefits owed to them upon

separation from employment." *Id*.  Any ambiguity in the terms of employment will be construed in

favor of employees.  *Id*.  The Court has considered the parties' arguments and finds that there are

genuine disputes of material fact precluding an award of summary judgment with respect to

Plaintiff's WPCA cause of action. The parties do not dispute that: Defendant is subject to the

WPCA; wages are comprised of fringe benefits, among other things;  incentives and bonuses are

fringe benefits; Plaintiff's separation from West was effective January 1, 2009, and Defendant paid

Plaintiff his final paycheck on January 9, 2009 in the amount of $6,177.00.  However, there is a

genuine dispute of material fact with respect to whether Plaintiff was discharged or laid-off as a

result of the redistricting.  Plaintiff sought twenty-two positions at West after he was notified that

his job was eliminated and after the effective date of his termination.  Consideration of whether

Plaintiff was discharged or laid off will control whether W. Va. Code § 21-5-4(b) or (d) governs the

timeliness of Plaintiff's last paycheck.  Further, there is a genuine dispute as to whether Plaintiff's

incentive bonuses were capable of calculation.  Merely asserting that Defendant's policy provides

for calculation after a certain time period does not render it entirely impossible that Defendant was

---

[9]  "Fringe benefits are defined as "any benefit provided an employee or group of employees by an employer, or which is required by law, and includes regular vacation, graduated vacation, floating vacation, holidays, sick leave, personal leave, *production incentive bonuses*, sickness and accident benefits and benefits relating to medical and pension coverage." W. Va. Code § 21-5-1(l).

23

capable of determining and calculating Plaintiff's incentives, including charge backs and refunds. Finally, Plaintiff has contended, among other things, that his sales figures were not calculated properly on his scorecard year-to-date.  He alerted members of Defendant's management to his concerns in multiple emails.  The Court, giving the Plaintiff the benefit of all inferences,  is not entirely convinced, on the record before it, that there is no genuine dispute regarding the calculation of Plaintiff's incentive bonuses.  For these reasons, the Court finds that Defendant's motion for summary judgment as to Plaintiff's WPCA claim is denied.

## IV.  CONCLUSION

In sum, the Court has considered Plaintiff's claims, the evidentiary record and the parties' contentions, the Court does hereby **ORDER** that Defendant's Motion for Summary Judgment (Document No. 52) be **DENIED IN PART**.  Specifically, the Court grants Defendant's motion with respect to Plaintiff's first cause of action to the extent that Defendant challenged the use of common law civil conspiracy and tortious interference as sources of substantial public policy.  The Court **ORDERS** that the balance of Defendant's motion be denied.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:  August 11, 2011

IRENE C. BERGER, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

24